**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
WESTERN DIVISION**

| | | |
|---|---|---|
| Lorrie R. Meier, | ( | |
| | ( | |
| Plaintiff, | ( | Case No. 3:20-cv-50096 |
| | ( | |
| v. | ( | Honorable Iain D. Johnston |
| | ( | |
| Pacific Life Insurance Company, | ( | |
| | ( | |
| Defendant. | ( | |

**<u>MEMORANDUM OPINION AND ORDER</u>**

Ronald (Ron) Meier applied for a life insurance policy worth \$315,817. After applying but before receiving the policy, he was diagnosed with terminal cancer and decided to change his policy from a 1035 exchange for his current life insurance to an additional policy so he would have at least one policy in effect. He died one year later, and the insurer denied his beneficiary's claim due to the material misrepresentation based on the failure to disclose his cancer diagnosis. The beneficiary (Ron's wife, Lorrie) then sued. For the reasons that follow, Pacific Life Insurance Company's motion for summary judgment is granted.

**I.     BACKGROUND[1]**

**May 2018 – Informal Application for 1035 Exchange Life Insurance**

Ron and Lorrie had life insurance policies with Voya at the beginning of 2018. They were not looking for new insurance policies; however, someone from Monarch Solutions LLC ("Monarch") called them to review their current policies. Kevin Klaas, the owner of Monarch, was an insurance producer who assisted individuals in selecting a life insurance policy in

---

[1] The Court takes the findings of fact from Defendant's Local Rule 56.1 Statement of Facts (Dkt. 82) and Plaintiff's Statement of Additional Facts (Dkt. 86).

exchange for a commission from the insurance carrier, not the applicant. Insurance producers typically begin with an informal inquiry process to determine coverage eligibility and rates. During this process, the applicant submits an informal application for insurance without formally applying for a policy, then the producer solicits quotes from different insurance carriers and helps the applicant select a carrier. Klaas had a producer agreement with Pacific Life Insurance Company ("PLIC"), which authorized him to solicit and procure applications and service the contracts by PLIC. Klaas viewed his role as serving both PLIC and his client.

On May 4, 2018, Nurse Robin Eklund, met with Ron, conducted an examination, and took his health history which included the question, "Have you ever been diagnosed by, or been treated by a licensed medical professional for . . . [a]ny tumor, cancer, cysts, melanoma, lymphoma, or any disorder of the lymph nodes?" Ron truthfully answered "No" to this question. His response was recorded on a Lincoln Financial Group document titled "Medical Supplement (Part II of Application)" (hereinafter "Medical Supplement"). Dkt. 74-5; Dkt. 82, ¶ 27. Ron, as a Proposed Insured, signed this form on May 4, 2018, at least two months before he formally applied for life insurance. On the form, Ron indicated that his answers were true on the day he signed the form. Above the signature block, the document included the following provision: "I agree that this Medical Supplement constitutes part of the application for insurance." Dkt. 74-5, at 2. Nurse Eklund also signed this form in the location designated for "Witness (Examiner/ Licensed Representative/Agent)." Additionally, when Nurse Eklund examined Ron on May 4, 2018, she completed a Lincoln Financial Examiner's report, which is not attached to the present motion. Dkt. 52-2. This document only had one signature line, for the Examiner, and included no statements indicating that it was part of an application.

The Medical Supplement was provided to PLIC to begin the underwriting process for the informal inquiry on June 18, 2018, to provide Meier with a tentative quote for insurance.[2]

**July 2018 – Formal Application**

Two months later, Ron executed a formal 12-page Application for life insurance with PLIC for a 1035 exchange policy, through which the new PLIC policy would replace the applicant's existing Voya policy. Ron signed this 12-page application on July 26, 2018. Dkt. 74-9, at 12. Included in his application was a section on page 4 titled "Medical Certification" with instructions to "[c]omplete when submitting a medical examination from another life insurance company, if dated within the last 6 months." Dkt. 74-9, at 4. This portion of the application referred to an "attached examination" from "Lincoln Financial" dated May 4, 2018. A handwritten note on the form states, "Exam was completed as part of informal application. The only formal application is this one." *Id.* There is no document called a "medical examination" among the evidence. This application also listed the Voya policy number and indicated that it should be replaced through a 1035 exchange. *Id.* at 5.

A section near the end titled "Declarations of All Signing Parties" begins, "The answers provided in this application are true and complete to the best of my knowledge and belief." Dkt. 74-9, at 11. Declaration 4 provides when coverage will begin:

> … coverage will take effect when the policy is delivered and the entire first premium is paid only if at that time each Proposed Insured is alive, and all answers in this application that are material to the risk are still true and complete.

---

[2] Plaintiff argues that Ron did not provide the Medical Supplement to PLIC, yet PLIC did, in fact, receive the document. Drawing all reasonable inferences in the light most favorable to the non-movant, for the purposes of this motion, Ron did not provide the Medical Supplement to PLIC directly. The reasonable inference is that Klaas provided the document to PLIC. But, for reasons articulated below, the specifics of how PLIC received the Medical Supplement are not material.

Declaration 6 provides for notifying the insurance carrier of changed circumstances:

> I must inform the Producer or PLIC in writing of any changes in the health of any Proposed Insured(s). If any of the statements or answers previously provided on the ticket/request (if applicable), applications, and medical forms change prior to delivery of the policy, I am obligated to notify PLIC of the changes in writing no later than at the time the application is signed by the Proposed Insured(s).

Declaration 12 provides for the basis of the policy issuance:

> The statements and answers in the application are the basis for any policy issued by PLIC, and no information about the applicant will be considered to have been given to PLIC unless it is stated in the application.

Declaration 15 provides for incorporation:

> This application will be attached to and made part of the policy.

Declaration 16 provides for certification of completeness and accuracy:

> I HAVE READ the completed Application and all related forms before signing below. All statements and answers on this application are correctly recorded, and are full, complete and true to the best of my knowledge and belief.

Directly beneath these declarations and above Ron's signature, the document states, "Review the answers on this Application carefully. If any of your answers are incorrect or untrue, even if unintentional, the company may have the right to deny benefits or rescind your coverage if the misrepresentation is deemed to be material." Dkt. 74-9, at 12. The signatures of Ronald Meier and Kevin Klaas appear at the end of this section. On July 31, 2018, PLIC's underwriting department reopened Ron's inquiry as a formal application.

**August 2018 – Formal Application Review and Cancer Diagnosis**

An internal PLIC document titled "Initial Review/Tentative Evaluation" and "Formal Application" is dated August 3, 2018. Dkt. 74-12. In the footer, it states, "For Broker-Dealer and/or Life Insurance Producer Use Only. Not For Use with the Public." This document listed Ron's PLIC policy number, contact information for the Underwriter and Case Manager on his

account, the total maximum death benefit amount of $315,817, and placed Ron in the "Preferred Smoker" category. The document further provided that the "Tentative Assessment is subject to our review of the requirements below," and listed two requirements, one of which says, "Risk Correspondence - Please provide details of the decision outcome with Lincoln Financial, provide reasons why if rated or declined." Dkt. 74-12. There were no signatures on this document.

Klaas testified that PLIC "formally approved" the application for the 1035 exchange policy on August 3, 2018. Dkt. 82, ¶ 46. PLIC disputes this and asserts that the policy was formally approved on August 10, 2018. Dkt. 85, at 18.

On August 6, 2018, Ron was diagnosed with cancer and began treatment within two days. Michael White, Ron and Lorrie's financial advisor for over fifteen years, testified that on August 14, 2018, Lorrie called White to tell him that Ron was diagnosed with Stage IV cancer and that she was concerned about replacing their Voya policies with PLIC policies. Because she didn't have the PLIC policy yet, White advised her to stop the exchange because of Ron's condition. Several days later, White informed Klaas about Ron's cancer diagnosis and told him to discontinue the 1035 exchange. Klaas assured White that he would take care of things and didn't ask for anything else. Dkt. 81-5, at 16:20-22:4.

On August 22, 2018, Louisa James from Monarch emailed Denise Mueller at PLIC with an update on Ron's insurance policy. Dkt. 74-20. In the email, she explained the cancelation of the 1035 exchange:

> **Ron:** Kevin talked with him and he actually wants to cancel the 1035 of the Voya policy and instead pay for it with an annual or monthly premium. [. . .]
> To clarify on Ron's policy…they forgot that the old Voya policy was set up as collateral for their business. So as to not mess around with their business stuff, he just wants to pay for this new Pacific Life policy with his own funds instead of getting it from the 1035.

5

No other replies or responses are included with this email chain. Monarch made no mention of the cancer diagnosis in this email.

Lorrie testified that the cancelation of the 1035 exchange might have been "because of his medical condition," to ensure that Ron "had at least one" life insurance policy because she knew "there was some kind of problem if you have a health issue early on in your policy." *Id.* at ¶ 56.

On August 29, 2018, PLIC re-approved the issuance of the policy, this time as a non-1035 exchange.

**September 2018 – Issuance of Life Insurance Policy**

On September 5, 2018, PLIC issued a universal life insurance policy to Ron, which he received on September 7, 2018. PLIC also sent Ron an Amendment to Application, which accounted for the new policy as a non-1035 exchange and a Policy Delivery Receipt.

The Amendment to Application referenced Ron's PLIC policy by number and listed the policy's issue date as September 5, 2018. Dkt. 74-16. The Amendment also listed the annual premium amount and included a list of all the amendments to the original application form in the "Remarks" section, referencing each question by page number, section, and question. All of these changes appear to be related to the change from 1035 exchange to a non-1035 exchange. Dkt. 74-16, at 1. The "Signatures" section provides for the truth and completeness of representations:

> By signing below you agree that this amends the application for the policy number shown and that each person signing the application change form agrees that all representations made in the form are true and complete to that person's knowledge and belief on the date signed. You further agree this is to be attached to and made part of the policy.

On the line marked Policyowner's Signature, a signature purporting to be Ron's appears. The document was also signed by Kevin Klaas as the Soliciting Producer. The signature page is dated September 7, 2018. Dkt. 74-16, at 3.

The Policy Delivery Receipt begins with an acknowledgment of receipt of the PLIC policy. It provides for the effective date:

> …insurance coverage under the Policy takes effect when the Policy is delivered and the initial premium is paid, and:
> · only if at that time the proposed insured(s) is (are) alive, and;
> · all answers in the application are still true and complete (a copy of the application is attached to the Policy for your review).

The Signatures & Policy Delivery Date section was dated September 7, 2018, and included a signature appearing to be Ron's. Kevin Klaas also signed this document. Dkt. 74-17. Lorrie claims that Ron did not sign the Amendment or the Policy Delivery Receipt and disputes the signatures. Dkt. 46-1, ¶ 10.

The PLIC policy itself is dated September 5, 2018, and was only signed by the PLIC President and CEO and its Secretary. The Definitions section begins on page 39 and states, "Defined terms are usually capitalized to provide emphasis." Dkt. 74-15, at 39. "Application" is defined as follows:

> **Application** – consists of the application for this Policy, including any Certificate of Health, Statement of Good Health and Insurability, amendments, and endorsements, supplements, approved policy change requests and any application for reinstatement or increase in benefits.

And in the General Provisions section, the policy provides as follows:

> **Entire Contract** – This Policy is a contract between you and us. This Policy, Policy Specifications and Indexed Accounts, the attached copy of the initial Application, including any supplements, amendments and endorsements to the Application, any Supplemental Schedules of Coverage, any Applications for Reinstatement, all subsequent Applications to change the Policy including change in smoking status, Risk Class, any endorsements, benefits, or riders, and all additional Policy information sections added to this Policy are the Entire Contract. Only our

President, Chief Executive Officer or Secretary is authorized to change this contract or extend the time for paying premiums. Any such change must be in writing.

All statements in this Application shall, in the absence of fraud, be deemed representations and not warranties. We will not use any statement to contest this Policy or defend a claim on grounds of misrepresentation unless the statement is in an Application.

Dkt. 74-15, at 54. The first page of the policy states that the Application is attached to the policy, which is consistent with the language in the Application and Policy Delivery Receipt.

### September 2019 – Ron Passes

Almost one year later, Ron died of cancer on September 18, 2019. Lorrie, the beneficiary on Ron's policies, submitted claims on behalf of Ron for both the Voya and PLIC policies. PLIC began an inquiry.

### December 2019 – Claim Inquiry and Denial

On December 9, 2019, PLIC Claims Administrator Carolyn Flores sent an email to other PLIC employees regarding completion of its "contestable claim inquiry" on Lorrie's claim.[3] In the email, she explains that they found Ron "did not disclose the cancer diagnosis to [PLIC] during the underwriting process, and his Policy Delivery Receipt dated 9/7/2018 did not indicate any changes to his health at the time of delivery." Dkt. 74-13, at 1. Flores cited the answer to question 5b on the Medical Supplement as being "incorrect at the time of policy delivery." *Id.* She also referenced a possible COPD diagnosis from 2015 that came up during their inquiry, but admitted that he may not have known of this diagnosis. *Id.* at 2. The email sought an opinion about denying the claim because "one or both of the findings above are material to [PLIC's] risk." *Id.* Klaas told PLIC, "When [Klaas, Ron, and Lorrie] applied for coverage they (and I)

---

[3] The titles and functions of the recipients are unknown; however, all recipients have an email address "@pacificlife.com" and the Court draws the reasonable inference that the recipients are PLIC employees.

were not aware of any major health issues that Ron was dealing with," and did not mention his discussion with White about Ron's diagnosis. Dkt. 82, ¶ 66. Chad Goforth responded to this email on December 18, 2019, attaching two letters—one to the beneficiary, one to the producer—denying the claim for Ronald Meier. Dkt. 74-13, at 1.

On the same day, Flores mailed a claim denial letter to Lorrie Meier. The letter explained that Ron "made certain representations to Pacific Life" in the Medical Supplement and Policy Delivery Receipt, "[c]ollectively . . . referred to as the application ('Application')." Dkt. 74-14, at 1. Flores relied on the representations Ron made in these documents, which bore his signatures dated May 4, and September 7, 2018, respectively. Flores explained that Ron affirmed the language in the Policy Delivery Receipt when he signed it, and that a review of his medical records showed that "certain answers on the Application for the Policy were incorrect at the time the Policy was delivered to Mr. Meier on September 7, 2018." *Id.* (citing 5b and 5e on the Medical Supplement). Further, she wrote the following:

> By signing the Application, Mr. Meier agreed that he would notify Pacific Life if any of his statements or answers given in the Application changed prior to Policy delivery. However, when Mr. Meier accepted delivery of the Policy on September 7, 2018, he did not amend his answers on the Application to reflect the changes in his health between the dates he completed [the Medical Supplement] and when the Policy was delivered.

Dkt. 74-14, at 2. The letter stated that PLIC is contesting the policy "due to the misrepresentations on the Application" and was returning the premiums paid toward the policy. *Id.*

Additionally, Flores explained that if Ron accurately answered 5b and 5e "upon receiving the Policy," it would have gone back for underwriting approval and PLIC would have declined to issue the policy. Because of this, PLIC found "the misrepresentations and omissions on the Application to be material to undertaking its risk." The letter further stated that PLIC's decision

to deny the claim was "based upon information currently available and is made without waiving any rights, remedies or defenses which Pacific Life may assert in the future." PLIC enclosed a check returning the $8,606 worth of premiums paid on the policy and explained it would not pay the death benefit "due to the misrepresentations on the Application." Dkt. 82, ¶ 67.

**March 2020 – Initiation of this Action**

Lorrie then filed the present action against PLIC, alleging three counts: (I) breach of contract and violation of 215 ILCS 5/155; (II) negligent delay in issuing the insurance policy; and (III) declaratory relief as to benefits due and whether PLIC acted unreasonably and vexatiously in its denial. Dkt. 52. PLIC filed a counterclaim for equitable recission under 215 ILCS 5/154 based on fraud (Count I) and material misrepresentation (Count II). Dkt. 21. PLIC now moves for summary judgment on all counts of Plaintiff's Complaint and Count II of its counterclaim. Dkt. 72.

## II. LEGAL STANDARD

On summary judgment, the Court must construe the "evidence and all reasonable inferences in favor of the party against whom the motion under consideration is made." *Rickher v. Home Depot, Inc.*, 535 F.3d 661, 664 (7th Cir. 2008). The moving party bears the burden of showing that "no genuine dispute as to any material fact" exists and that it is "entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). The initial burden lies with the movant to either show an absence of evidence supporting an essential element or to present affirmative evidence showing that an essential element cannot be satisfied. *Hummel v. St. Joseph County Bd. of Comm'rs*, 817 F.3d 1010, 1016 (7th Cir. 2016). Then, the burden shifts to the nonmoving party to present evidence that establishes a genuine

issue of material fact as to that element. *Lewis v. CITGO Petroleum Corp.*, 561 F.3d 698, 702 (7th Cir. 2009) ("to survive summary judgment, the nonmoving party must present evidence sufficient to establish a triable issue of fact on all essential elements of its case"). A genuine dispute of material fact exists if a reasonable jury could return a verdict for the non-movant when viewing the record and all reasonable inferences drawn from it in the light most favorable to the non-movant. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *Beardsall v. CVS Pharmacy, Inc.*, 953 F.3d 969, 972 (7th Cir. 2020). Thus, to survive summary judgment, the non-movant must set forth specific facts showing that there is a genuine dispute of fact for trial. *MAO-MSO Recovery II, LLC v. State Farm Mut. Auto. Ins. Co.*, 994 F.3d 869, 876 (7th Cir. 2021) (citing *Grant v. Trustees of Indiana Univ.*, 870 F.3d 562, 568 (7th Cir. 2017) ("As the put up or shut up moment in a lawsuit, summary judgment requires a non-moving party to respond to the moving party's properly-supported motion by identifying specific, admissible evidence showing that there is a genuine dispute of material fact for trial.")). "Summary judgment is only warranted if . . . [the court] determine[s] that no jury could reasonably find in the nonmoving party's favor." *Blasius v. Angel Auto, Inc.*, 839 F.3d 639, 644 (7th Cir. 2016).

III. <u>**DISCUSSION**</u>

PLIC argues that it is entitled to summary judgment for several reasons. **First**, it argues that the failure to disclose Ron's cancer diagnosis is a material misrepresentation based on the change in health clause in its application materials. Under Illinois law, which the parties agree govern this insurance contract, if the insured's misrepresentation materially affects the acceptance of the risk assumed by the insurer, recission is permitted. 215 ILCS 5/154. The contract required written notice to PLIC or Klaas, and argues that any oral notice to Klaas is

immaterial and cannot be imputed to PLIC because Klaas did not have authority to waive the written notice requirement, as he was an agent of the Meiers, not PLIC. **Second**, PLIC argues, in the alternative, that the Policy never went into effect because the Application provides, as a condition precedent, that coverage takes effect at time of delivery only if the answers in the application that are material to the risk are still true and complete. **Third**, PLIC argues that summary judgment is proper on Lorrie's Section 155 claim because there is a bona fide dispute regarding coverage and its conduct was not vexatious or unreasonable. **Fourth**, PLIC argues it is entitled to summary judgment on Lorrie's negligent delay claim because it did not fully approve Ron's policy until *after* Ron's diagnosis; the tentative approval before the diagnosis is not dispositive.

In response, Lorrie argues **first** that PLIC cannot prove materiality because no health history was required for the application, based on a narrow reading of the deposition testimony of PLIC's chief underwriting officer. **Second**, she argues that a question of fact exists as to whether the Medical Supplement was part of the PLIC Application as opposed to the application (lowercase, not defined term). **Third**, Lorrie argues that it is an issue of material fact as to whether Declaration 6 required Ron to notify PLIC of changes in health after he signed the document, citing the "mend the hold" doctrine in Illinois. **Fourth**, she argues that there is an issue of fact as to notice to Klaas, in that after White orally notified Klaas and said Ron wanted to change to a non-1035 exchange policy, White remembers Klaas saying that he would submit a report to PLIC. **Fifth**, Lorrie argues that Klaas's status as agent and broker is an issue of material fact because his actions showed he was an agent of PLIC, despite the language of his producer agreement. **Sixth**, Lorrie contends that there is an issue of fact as to PLIC's delay in issuing the policy because PLIC admitted an internal error caused a five-day delay in issuing the policy.

**Seventh**, Lorrie asserts that there is an issue of material fact as to PLIC's conduct with regard to her Section 155 claim in that its underwriter testified that a health history was not required and its claim denial letter cited a required health history.[4]

In reply, PLIC **first** argues that its reliance on Declaration 6 in litigation is not barred by the mend the hold doctrine because it was referenced and incorporated into its original position in the claim denial letter. **Second**, PLIC also argues that the system error's causing a five-day delay is inapposite because the error occurred after the policy was approved on September 10, four days after Ron's diagnosis. **Finally**, PLIC argues that the policy did not go into effect because either it was not signed and received or Ron made a material misrepresentation when signing it.

The Court will address each of the relevant issues in turn.

### A. Was the Medical Supplement Part of PLIC's Application for Life Insurance?

Lorrie asserts that "the application makes no reference to a medical supplement from Lincoln Financial or any company," and that the "only Lincoln Financial document expressly referenced on the application is the examination referred to on page 4." Dkt. 79, at 6. It is undisputed that when PLIC began its formal application process, it also received a copy of the Medical Supplement from the informal inquiry. Dkt. 82, ¶ 38. The "Medical Certification" section on page 4 of the application indicates that an "examination" from "Lincoln Financial" dated May 4, 2018, is attached. (Neither "examination" nor "certification" nor "supplement" is a defined term in the policy.) Lorrie argues that this section of the application refers to the

---

[4] Lorrie does not directly address PLIC's second argument that the policy coverage never went into effect. For the purposes of summary judgment, because Lorrie ultimately seeks damages under section 155, the Court draws the reasonable inference that it is her position that the policy coverage did, in fact, go into effect, despite the disputed signatures.

Examiner's Report completed by Nurse Eklund, and not the corresponding Medical Supplement because the application expressly uses the term "examination" and not "supplement."

Indeed, the document does not contain the word "supplement" on page 4 or elsewhere. However, page 11 of the application refers to statements on "the application", "applications", and "medical forms," and page 12 refers to the "Application and all related forms" and "this application." Dkt. 74-9, at 11-12. The Medical Supplement also states in multiple places that it is "part of the application for insurance" and "Part II of Application." Dkt. 74-5. For the purposes of this motion, the 12-page application does not incorporate the Medical Supplement.

But the Court's analysis does not end here. PLIC argues that its definition of the term "Application" in its policy incorporates "supplements." Lorrie does not dispute this. Instead, she asserts that the application Ron signed on July 26, 2018, was an application, not an Application.[5] Dkt. 79, at 12-13. As Lorrie correctly points out, this definition is only included in the policy, which is always issued *after* an application is signed, and ultimately, approved. Dkt. 79, at 12 n.11. An applicant would not have access to this definition when filling out and signing the application. In this case, it would have been July 26, 2018.

The policy states the "Application . . . consists of the application [lowercase] for this Policy, including any . . . supplements" and states that "Defined terms are usually capitalized to provide emphasis." Dkt. 74-15, at 39. Further, the policy's merger clause incorporates "Application, including any supplements" as the entire contract. *Id.* at 54. By Lorrie's argument, an Application includes an application and supplements, but an application does not include an Application or supplements. Application (uppercase) is the broader term, but an insured would

---

[5] The Court admittedly has difficulty following this argument, and Plaintiff's counsel offers no suggestion for what an Application (uppercase) would actually be in this scenario. Without an application (whether lower or upper case) no policy would have been issued.

not have access to this definition until receiving the policy and would not understand that the supplement was part of the application. Going along with that, the Policy Delivery Receipt, which is signed at the time the insured receives the policy, states that coverage "takes effect when the Policy is delivered and the initial premium is paid, and . . . all answers in the application are still true and complete (a copy of the application is attached to the Policy for your review)."[6] Dkt. 74-17, at 1. Lorrie's reading would take that language to refer to only the 12-page application, not any supplements. That would make sense only if the policy's plain and ordinary language itself did not contradict that reading by stating that "defined terms are *usually* capitalized to provide emphasis." Dkt. 74-17. Although PLIC's capitalization practices are particularly unhelpful, at the time the Policy Delivery Receipt was signed on September 7, 2018 (by Ron or by someone forging his name, more on that below), the answers on the Medical Supplement were unambiguously incorporated into the a/Application, regardless of whether they were part of the application signed on July 26, 2018. To be clear, in September 2018, the representations Ron made in the Medical Supplement and 12-page application were subject to the acknowledgments on the Policy Delivery Receipt.

On summary judgment, the court must draw all *reasonable* inferences in favor of the non-moving party. *Cole v. Bd. of Trs.*, 838 F.3d 888, 895 (7th Cir. 2016). Plaintiff's counsel asks this Court to draw two inferences: (1) Ron did not consider the Medical Supplement he signed after he was examined by a nurse to be a "medical form" or a "related form" or to be any part of his formal application for insurance, despite the supplement's language incorporating it into the application; and (2) PLIC's Policy Delivery Receipt, in which the insured avers that

---

[6] The parties do not reveal which documents, if any, were attached to Ron's policy. Providing this information would have been helpful in deciding this motion.

coverage takes effect if the "answers in the application are *still* true and complete," intends a narrow definition of "application" that does not include supplements and ignores the defined term and statement that that defined terms are usually—but not always— made uppercase for emphasis. (Emphasis added). Although Lorrie is entitled to the benefit of inferences reasonably drawn from the facts, she is not entitled to every conceivable inference. *De Valk Lincoln Mercury, Inc. v. Ford Motor Co.*, 811 F.2d 326, 329 (7th Cir. 1987); *see also Rand v. CF Indus.*, 42 F.3d 1139, 1146 (7th Cir. 1994) (non-movant only entitled to reasonable inferences); *Banke Leumi Le-Israel, B.M. v. Lee*, 928 F.2d 232, 236 (7th Cir. 1991) (only reasonable inference drawn in favor of non-movant). It is unreasonable to infer that the policy's Definitions page's statement that "defined terms are usually capitalized to provide emphasis" allows for a different definition of Application and application on the Policy Delivery Receipt. For the purposes of this motion for summary judgment, the Court finds that the Medical Supplement was part of the application on September 7, 2018, when Ron Meier received the policy.

### B.  Was Ron's Cancer Diagnosis Material to PLIC's Risk?

Most life insurance policies rely on an applicant's medical history and current health, whether through an exam, answers to questions, a call to the doctor's office, or a form. *See* Stephen Plitt, et al., 6 COUCH ON INSURANCE § 87:9 (3d ed. Dec. 2021) ("There is generally a duty to disclose all health-related conditions, diseases, illnesses, treatments, and hospitalizations that are more than trivial in nature, at least where health or general longevity of the proposed insured is arguably material to the insurer's willingness to underwrite the risk involved."), § 138:2 ("insurers generally take great care to formally question and physically examine applicants as to any history, habits, or activities that may unduly increase the risk"). This

information factors into the actuarial calculation for premiums and overall policy value. *See id.* at § 1:39 ("The uncertainty of the value of an insured life is mathematically offset by the fact that the premium charged is computed based on the amount of the insurance, compared to actuarial determinations of the likelihood of the death occurring during the period of the policy."). It is axiomatic that an applicant's health is material to a standard or universal life insurance policy. *See id.* at § 87:37.[7] Indeed, life insurers include change-in-health clauses "to help ensure it will know whether the applicant's health has changed during the few weeks that intervene between the date of his physical and his payment of the first premium." *Massachusetts Mut. Life Ins. Co. v. O'Brien*, 5 F.3d 1117, 1121 (7th Cir. 1993). And many also include some sort of conditional receipt that requires an applicant to affirm the truth of all previous answers at the time of delivery. *See id.* at 1122.

Misrepresentations are considered material if "reasonably careful and intelligent persons would have regarded the facts stated as substantially increasing the chances of the events insured against, so as to cause a rejection of the application." *Northern Life Ins. Co. v. Ippolito Real Estate Partnership*, 624 N.E.2d 1266, 1276 (Ill. App. Ct. 1993). Even when an honest mistake as to a material fact is made, the insurer can void and rescind the contract in Illinois. *Ratcliffe v. International Surplus Lines Ins. Co.*, 550 N.E.2d 1052, 1057 (Ill. App. Ct. 1990); *Royal Maccabees Life Ins. Co. v. Malachinski*, 161 F. Supp. 2d 847, 853-53 (N.D. Ill. 2001) ("Rescinding an insurance contract is a complete defense to an action on the policy."). And in the Seventh Circuit, "[i]ncomplete answers or a failure to disclose material information on an [insurance] application may constitute a misrepresentation when the omission prevents the

---

[7] Many insurers offer Guaranteed Issue policies, which are offered to any eligible applicant fitting its criteria. These policies are regularly issued to applicants without regard to the applicant's status. The parties do not dispute that Ron's policy was Indexed Universal Life.

insurer from adequately assessing the risk involved." *Methodist Med. Ctr. v. American Med. Sec.*, 38 F.3d 316, 320 (7th Cir. 1994). Although materiality is often a question of fact, "summary judgment is appropriate where the misrepresentation is of such a nature that no one would dispute its materiality."[8] *Id.*

Here, when Ron informally applied for insurance, a nurse visited him, performed an exam, and they completed the Medical Supplement, in which he stated that he had never been diagnosed with or treated for cancer. At the time, that statement was truthful and accurate. But by the time the policy was issued and when Ron had to confirm the statement was *still* truthful and accurate, Ron had been diagnosed with and started treatment for stage IV cancer. During the claim inquiry process, PLIC determined that it would not have insured his life had they known of his diagnosis. Lorrie argues that Flores's "previously undisclosed" declaration as to materiality (Dkt. 74-10) should not be allowed. Dkt. 79, at 7. But reliance on her declaration is hardly necessary because the Claim Denial Letter Flores sent to Lorrie on December 19, 2019, which Lorrie does not dispute receiving, expressly states, "Had Mr. Meier answered the questions accurately on the Application upon receiving the Policy, . . . Pacific Life would have declined to issue the Policy upon reviewing Mr. Meier's medical records." Dkt. 74-14, at 2. Lorrie takes further issue with Flores's opinions because she lacks personal knowledge of PLIC's procedures and was also never disclosed as a Rule 26 witness. Dkt. 79, at 8. Fed. R. Civ. P. 37(c)(1), 1993 Advisory Committee Notes ("the inadvertent omission from a Rule 26(a)(1)(A) disclosure of the name of a potential witness known to all parties" is a "harmless" violation).

---

[8] Plaintiff does not cite any case law regarding what constitutes a material misrepresentation, instead, only notes that the burden of proof in a recission action is on the insurer. Dkt. 79, at 7 (citing *Direct Auto Ins. Co. v. Beltran*, 998 N.E.2d 892 (Ill. App. Ct. 2013)).

Lorrie asserts that based on the deposition testimony of PLIC's "<u>actual</u> underwriter" Virginia Craig, PLIC's underwriting rules did not require Ron's health history, and if health history was not required, a cancer diagnosis could not be material to PLIC's risk. Dkt. 79, at 8 (emphasis in original). The Court read Ms. Craig's deposition transcript closely and cannot find a genuine dispute of material fact here. The specific page and line numbers cited by Plaintiff do state that no health history was required, but they are taken out of context. More than once in this cross-examination, Ms. Craig attempted to explain that the health history she was being questioned about referred to "additional [Pacific Life] health history" if what they received from another provider was outdated. *See, e.g.*, Dkt. 81-1, at 132:11-17, 142:7-21. And Ms. Craig also attempted to explain that, despite the unhelpful document names and cross-references, the medical examination referred to on page 4 of the application was, in fact, the Medical Supplement, and the Examiner's Report was considered part of the Medical Supplement. *Id.* at 44:14-23, 45:7-46:18. And as PLIC asserts, her testimony also includes numerous references to the fact that PLIC's underwriting requires a medical supplement or updated health history and would not have approved the policy without one. Dkt. 85, at 11-12.[9]

Eight months after her deposition, she signed a declaration restating portions of her deposition testimony. Craig, as Chief Underwriting Officer for PLIC, also submitted a declaration in which she stated that PLIC did not require a health history for Ron because it received the Medical Supplement. Dkt. 74-6, ¶¶ 10-14. This is not a situation in which a party seeks to manufacture an issue of fact—or to avoid one—by contradicting sworn deposition testimony, but rather, one in which a witness's subsequent declaration clarifies varying and

---

[9] This appears to be common practice. *See* 6 COUCH ON INSURANCE § 87:2 (insured has duty to update information material to the risk in time between insurer's medical exam and when policy issues; failure to do so can amount to fraud); *see also* Restatement (Third) of Torts: Liability for Economic Harm, §13 (Am. Law Inst. 2020) (duty to correct representations that were true when made but no longer true).

uncertain deposition testimony. *See Employer's Fire Ins. Co. v. Meridian Magic, Inc.*, No. 1:03-cv-0603, 2004 U.S. Dist. LEXIS 24281, at *11-12 (S.D. Ind. Sep. 28, 2004). Lorrie argues that the statements in Craig's declaration are "flatly contradicted" by her own deposition testimony, and claims the statements in the declaration are "oblique" and "ambiguous" because it was drafted so as to avoid contradicting her deposition testimony. Dkt. 79, at 9-10. However, the Court is not persuaded by this argument. Craig repeatedly attempted to explain—and did explain—her testimony at the deposition, despite the haranguing. The declaration does not contradict her testimony. Instead, the declaration clarifies the testimony she was trying to provide over counsel's attempt to cabin it.

Unsurprisingly, in Illinois, a cancer diagnosis is material to a life insurer's risk. *See, e.g.*, *Lauer v. Am. Family Life Ins. Co.*, 769 N.E.2d 924 (Ill. 2002) (cancer diagnosis and chemotherapy treatment in the months before policy issuance was material to insurer's risk); *Krajewski v. Prudential Ins. Co.*, 26 N.E.2d 892 (Ill. App. Ct. 1940) (insured's non-disclosure of cancer diagnosis before policy issuance was material to insurer's risk); *W. & S. Life Ins. Co. v. Tomasun*, 193 N.E. 451 (Ill. 1934) (cancer diagnosis and treatment in the years prior to policy issuance was material to insurer's risk). This is precisely the type of health information that an insurer uses to determine risk, and policy value. Although questions of materiality are typically issues of fact, no reasonable person would dispute that a stage IV cancer diagnosis is material to a life insurer's risk, and Lorrie's attempts to create an issue of fact as to materiality cannot succeed. *Methodist Med. Ctr.*, 38 F.3d at 320; *see also* 6 COUCH ON INSURANCE § 88:87 ("An applicant affected with cancer is not in sound health, and the court will take judicial notice of the fact that cancer increases the risk of loss. . . . A negative answer as to cancer, if false, avoids the risk since cancer is a disease which increases the risk *and is material to it*.") (emphasis added).

PLIC offered multiple opinions from its employees stating that Ron's application would not have been approved if PLIC had known about his cancer diagnosis. Lorrie's attempt to use the Craig deposition to create an issue of fact is without merit. PLIC has met its burden as to materiality.

### C. Was PLIC's Claim Denial Vexatious and Unreasonable Pursuant to Section 155?

Section 155 of the Illinois Insurance Code provides a private right of action when an insurer, while litigating a claim, vexatiously and unreasonably contests the claim or delays its resolution. 215 ILCS 5/155(1). In Illinois, a bona fide dispute over coverage is a complete defense to a Section 155 claim. *Med. Protective Co. v. Kim*, 507 F.3d 1076, 1087 (7th Cir. 2007). A bona fide dispute is one that is "real, actual, genuine, and not feigned." *Illinois Founders Ins. Co. v. Williams*, 2015 IL App (1st) 122481, ¶ 34. Further, "assertions of legitimate policy defenses and denials based on a policy's express wording are inappropriate" reasons to bring claims under Section 155. *Scudella v. Illinois Farmers Ins. Co.*, 528 N.E.2d 218, 222-23 (Ill. App. Ct. 1988).

If PLIC's denial of Lorrie's claim was based on legitimate questions of fact as to the validity of the policy and any misrepresentations, it is entitled to judgement on the Section 155 claims. An insurer's identification of questions of fact in its review of the claim does not necessarily preclude summary judgment for the same reason. *See Illinois Founders Ins. Co.*, 2015 IL App (1st) 122481, ¶ 34 ("Thus, the fact that defendant may have proffered some evidence of [a genuinely disputed fact] would not militate against a grant of summary judgment as long as the evidence before [the insurer], in total, created a reasonable, genuine basis for dispute.").

Here, the pleadings, on their face, demonstrate a bona fide dispute in coverage. PLIC asserts that Ron's failure to disclose his cancer diagnosis between the time of completing the application and the time his policy became effective was a material misrepresentation. Lorrie asserts that Ron had no duty to disclose his diagnosis beyond the application date. PLIC's claim inquiry was based on the express language in its policy documents. That Lorrie unreasonably interprets the contractual language differently than PLIC does not make PLIC's claim of a bona fide policy dispute vexatious or unreasonable. The fact that she brought this lawsuit disputing this exact language does not defeat PLIC's position—on the contrary, it supports the claim that there is indeed a bona fide dispute.

Lorrie also contends that PLIC's claim of a bona fide dispute was a "conclusory assertion," and that its conduct was improper under Section 155 because it "abandoned its original defense and now asserts a new defense . . . in violation of the 'mend-the-hold' doctrine in Illinois." Dkt. 79, at 20. Further, she suggests that PLIC acted in bad faith because it did not verify Ron's signature on the Policy Delivery Receipt. Dkt. 79, at 14.[10] The Court is unpersuaded by these arguments.[11] Initially, PLIC reserved the right to raise any right, remedy, or defense when it notified Lorrie of the recission.  More importantly, the face of the pleadings clearly shows a bona fide dispute in coverage. The Court finds that PLIC pursued a bona fide

---

[10] Although neither party points to this fact, the Court notes that the Policy Delivery Receipt was also signed by Klaas.

[11] Lorrie asserts that PLIC's original defense as stated in the Claim Denial Letter was based on Ron's signature of the Policy Delivery Receipt and the corresponding affirmation that all answers were true at the time the policy was delivered. Dkt. 79, at 14. She suggests that "PLIC abandoned that defense in its MSJ, probably because it admits it has no evidence Ron Meier ever signed the Receipt." *Id.* What she fails to mention is the obvious reason why PLIC changed its position: It had no reason to question the signature until Lorrie first suggested it had been forged in her 2021 deposition. At that point, PLIC focused its defense on Declaration 6 of the application. Regardless, it was always PLIC's position that Ron had a duty to disclose his cancer diagnosis before the date on which the policy went into effect. Mend-the-hold does not apply in this situation.

coverage dispute, and therefore, Lorrie's claims based on Section 155—Count I (breach of contract) and Count III (declaratory judgment) cannot succeed. PLIC's motion for summary judgment as to Plaintiff's Counts I and III is granted.

### D. Was Oral Notice to the Producer Sufficient?

Lorrie argues that there is an issue of fact as to whether PLIC received notice of Ron's cancer diagnosis because Klaas—the producer—was told of the cancer in mid-August 2018 and "agreed to submit a 'field report' to PLIC in order to take care of that matter." Dkt. 79, at 16. Lorrie asserts that Klaas was PLIC's agent for the specific transaction of receiving notice of a change in health because the insurance application states, "I must inform the Producer or PLIC in writing of any changes." Dkt. 79, at 16. PLIC claims it was never notified of the diagnosis, and asserts that Klaas was not PLIC's agent and was not authorized to accept oral notice. Dkt. 85, at 3-7. Therefore, any notice provided to Klaas cannot be imputed to PLIC. Klaas is not and never was named in this action, and PLIC does not dispute that he was told of the diagnosis. Instead, PLIC argues it was never notified in writing, as required. Moreover, PLIC contends that Klaas was its broker, not its agent. The first argument is dispositive. No written notice was provided as required. Lorrie has not created a genuine issue of material fact on this point. Moreover, there is no genuine issue of material fact as to the agency of Klaas.

In Illinois, an insurance agent has "an exclusive, fixed, and permanent relationship to an insurance company that the agent represents and has certain duties and allegiances to that company," while an insurance broker "procures insurance and acts as middleman between the insured and the insurer, and solicits insurance business from the public under no employment from any special company." *Malachinski*, 161 F. Supp. 2d at 851 (internal citations omitted).

Although the question of whether a person is a broker or agent is typically one of fact, clear evidence of one or the other can make it a question of law. *Id.* Courts in Illinois look at a person's actions with regard to a particular transaction and consider four factors: (1) who first set the intermediary in motion; (2) who controlled the intermediary's actions; (3) who paid the intermediary; and (4) whose interest the intermediary represented. *Id.* at 851-52.

As to the first factor, it is undisputed that PLIC did not in any way instruct or encourage Klaas to reach out to the Meiers. Lorrie asserts that the fact that PLIC offered Klaas a sizeable commission for new business demonstrates PLIC set him into motion (Dkt. 79, at 17). But if that were enough, every broker who received a new business commission would be an agent. This is simply not the law. PLIC did not set Klaas into motion. As to the second factor, Lorrie's argument that PLIC closely regulated Klaas because PLIC's handbook controlled "the details of sales materials and forms he could use, and how he could communicate with customers" and authorizes him "to collect premiums and issue temporary insurance" is unpersuasive. Dkt. 79, at 17. Additionally, it does not support her position that Klaas was PLIC's agent *for the specific transaction of receiving notice of a change in health*. In his deposition, Klaas admitted that his Producer Agreement with PLIC imposed some requirements on him, but that he controls his own business, hires his own employees, and works with multiple other insurance companies beyond PLIC. Dkt. 85, at 4. Compliance with a broker agreement is not enough to create a question of fact. With regard to the third factor, it is undisputed that PLIC paid Klaas a commission and that Ron did not pay Klaas at all. However, who paid commission is given little weight in Illinois because insurers are permitted by law to pay a commission to their brokers. *Malachinski*, 161 F. Supp. 2d at 852 n.2. As to the last factor, Klaas testified that he considered Ron to be his client, not PLIC. Lorrie argues that this cannot be the case because Klaas never met Ron and wouldn't

help Lorrie submit the claim form for free. Dkt. 79, at 17. But Lorrie cites to no case law for the contention that one need meet someone personally to represent their interests, or the contention that representing someone's interests requires performing paid services for free. In consideration of these facts and factors, the Court finds as a matter of law that Klaas was not PLIC's agent, but rather, its broker.

A broker's knowledge cannot generally be imputed to the insurer. *Malachinski*, 161 F. Supp. 2d at 851. Beyond that, PLIC's policy expressly limited the Producer's scope of authority to accepting written notice. Lorrie asserts that PLIC, through its agent Klaas, waived the written notice requirement and that Illinois permits insurers to waive written notice requirements even in the presence of an anti-waiver clause. Dkt 79, at 17. While it may be permissible in Illinois, she has offered no evidence that PLIC actually permitted this, other than White's deposition that Klaas told him, when he informed him of the cancer diagnosis, that he would send PLIC a report. Klaas denies that he ever mentioned sending a field report, but this argument is unnecessary because only the company or its agent has authority to waive a notice requirement—not a broker like Klaas. Any notice of Ron's diagnosis by Klaas is therefore not deemed imputed to PLIC for the purposes of this motion.

### E. Did PLIC Negligently Delay in Issuing Ron's Policy?

An insurer has a general duty to promptly act on an application for insurance. *Talbot v. Country Life Ins. Co.*, 291 N.E.2d 830, 832 (1973) ("the agent or company owes an applicant for insurance what amounts to a legal obligation to act with reasonable promptness on the application, either by providing the desirable coverage or by notifying the applicant of the

rejection of the risk"). And Illinois courts require a plaintiff to prove that "that the insurance applied for could have been secured or that the insurance could have been secured elsewhere." *Geraghty v. Cont'l W. Life Ins. Co.*, 667 N.E.2d 510, 516 (1996) (citations omitted), *cited by Royal Maccabees Life Ins. Co. v. Peterson*, 139 F.3d 568, 570 (7th Cir. 1998).

Based on the documents described above and a timeline from PLIC (Dkt. 74-11), the Court establishes the following timeline for the relevant events of 2018:

| | |
|---|---|
| May 4 | Ron's examination; signed medical supplement |
| June 18 | PLIC receives informal application and medical supplement |
| July 26 | Ron completes and signs formal PLIC application |
| July 30 | PLIC receives Ron's application |
| August 3 | PLIC sends initial review/tentative evaluation to Klaas |
| August 6-8 | Ron diagnosed with stage IV cancer, begins treatment |
| August 10 | PLIC approves policy as Preferred Smoker and PLBR due to system error |
| August 15 | Policy was re-approved without PLBR |
| August 18 | PLIC begins 1035 exchange surrender with Voya |
| August 22 | Monarch emails PLIC with Ron's request to cancel 1035 exchange |
| August 24 | PLIC begins re-approval process for non-1035 exchange policy |
| August 29 | Policy was re-approved as non-1035 |
| September 5 | Initial premium paid; policy and delivery requirements sent to Klaas |
| September 7 | Ron signs policy delivery receipt and amendment (signature disputed, see below) |

Lorrie claims PLIC negligently delayed issuing Ron's life insurance policy. For support, she relies on a Seventh Circuit case finding a dispute of fact as to whether an insurer breached its duty to promptly act on an insurance application. *Royal Maccabees Life Ins. Co. v. Peterson*, 149 F.3d 568 (7th Cir. 1998). The insurer there approved Peterson's policy on May 2 and did not issue the policy until May 8. Peterson was diagnosed with cancer on May 7, five days after the insurer approved the policy. *Id.* The Seventh Circuit found that six-day delay to be a question of fact for a jury. In this case, PLIC approved Ron's policy on August 10, re-approved it on August

15 due to system error, then, at Ron's request to cancel the Voya exchange, re-approved it again on August 29. The policy was issued on September 5. Ron was diagnosed with cancer on August 6.

The Court has difficulty understanding which timeframe Lorrie claims was a negligent delay. Her response takes issue with the length of time it took to issue the policy on the whole. Dkt. 79, at 19 ("it took over a month to actually issue the policy" and "months passed before the policy was issued"). However, she also complains about the time between when the informal inquiry began in June and when the policy was issued, when the formal application was signed and when it was logged into the system, when the application was signed and the policy was issued, when underwriting began and the policy was issued, when the policy was tentatively approved and the policy was issued, and when PLIC's system error triggered re-approval and a five-day delay. *Id.* at 19-20. None of these situations are analogous to the time period at issue in *Peterson*, and thus, as PLIC argues, *Peterson* is distinguishable from the present facts.

The closest Lorrie comes is based on the seven days between August 3 and August 10, when Ron was diagnosed with cancer, based on Klaas's statement that the policy was approved August 3. In his deposition, Klaas was asked about an internal Monarch document that was produced in discovery. When asked if the document stated, "Approved Preferred Smoker" and "August 3, 2018" in reference to Ron's policy, Klaas replied that it did. Dkt. 74-2, at 101:9-102:4. Based on this, Klaas stated that PLIC approved the policy before Ron's cancer diagnosis on August 6. Then, the following exchange occurred:

> Q.  And to your knowledge, based on your experience in the industry and your experience working with Pacific Life, when they say that they approved the policy for issuance, that means that Pacific Life has determined that based on the information they had at the time Mr. Meier met all of their underwriting criteria that would allow them to issue this policy, correct?
>
> [objections by counsel]
>
> A.  That's correct.

Dkt. 74-2, at 103:3-14. Lorrie relies on this to establish that PLIC approved Ron's policy on August 3, 2018, which is necessary for her argument that PLIC's negligent delay caused the policy to be issued after he was diagnosed on August 6. But throughout the deposition, Klaas's view is based entirely on a document internal to *his* company, not a document from PLIC. Even in the exchange above, in the statement, "when they say that they approved the policy," the "they" cannot refer to any entity other than PLIC. Klaas's statement is not necessarily untrue, but it does nothing to advance the claim that PLIC approved the policy on August 3. In fact, PLIC's document dated August 3 expressly states that it is an initial approval/tentative evaluation. Dkt. 74-12.

PLIC asserts that even if the policy had been fully approved on August 3, it would have required the policy to be issued within one business day to have been issued before Ron's August 6 diagnosis.[12] Dkt. 85, at 18. Instead, PLIC asserts that the application was approved on August 10, four days after Ron's cancer diagnosis. This is important because it supports PLIC's contention that it would not have approved the policy had it known about his diagnosis. Indeed, the policy had not been fully approved when he was diagnosed. Dkt. 73, at 15.

Additionally, Lorrie's argument about the month-long delay in issuing the policy is unpersuasive. Certainly, there was a five-day delay caused by a system error, but that approval

---

[12] The Court takes judicial notice of the fact that August 3, 2018, fell on a Friday and August 6 fell on a Monday.

was for the original 1035 exchange policy, which, later in the month, Ron specifically requested be canceled. That delay cannot be foisted on PLIC. That cancelation triggered a seven-day re-approval process that caused the policy to be issued on September 5, over a month later. Lorrie has not sufficiently created an issue of fact with these dates, speculations, and selective quoting of deposition transcripts. And though neither party raised the negligent delay test from *Geraghty* which was expressly referred to in *Peterson*, the Court recognizes that no evidence was proffered to support the proposition that Ron could have secured insurance with PLIC or elsewhere absent delay. The Court grants summary judgment on Plaintiff's Count II.

### F.  What is the Effect of the Disputed Signature?

Finally, and perhaps most concerningly, is the issue of whether Ron signed the Policy Delivery Receipt. The Court struggles to understand Lorrie's position. If Ron did not sign the Policy Delivery Receipt, the policy could not have taken effect, and Lorrie could not recover the death benefit. Dkt. 85, at 10. On the other hand, if Ron did sign the Policy Delivery Receipt, the policy still could not have taken effect because his signature acknowledged that the policy would only take effect if "all answers in the application are still true and complete," which, on the signature date, they were not. *Id.* Lorrie offered no evidence showing that the policy had been delivered and was in effect. PLIC asserts that there is no evidence in the record to support the contention that Ron's signature was forged other than mere speculation that a Monarch employee could have done it because she had signed other people's names in the past. Dkt. 85, at 10. In the absence of evidence to the contrary, the Court agrees. Either way, Plaintiff cannot prevail.

**IV.     CONCLUSION**

For the reasons stated above, the motion for summary judgment is granted in favor of

Pacific Life Insurance Company. In so granting, the Court holds:

- Ron's cancer diagnosis was material to the risk undertaken by PLIC;

- PLIC did not negligently delay issuance of the policy; and *either*

  o   Ron misrepresented his health in when the policy was received; *or*

  o   The policy never went into effect because Ron did not sign the Delivery Receipt.

Judgment shall enter on all counts in the Complaint and Counterclaim. Civil case terminated.


Date:   March 30, 2022                By:   _____
                                            IAIN D. JOHNSTON
                                            United States District Judge